McCANDLESS, Commissioner of Immigration. v. UNITED STATES ex rel. DIABO.

Circuit Court of Appeals, Third Circuit. March 9, 1928.

No. 3672.

1. Indians ⬤⟳5,6—Indians are wards of nation, and general acts of Congress do not apply to them, unless clearly so intended.

Indians are all wards of the nation, and general acts of Congress do not apply to them, unless so worded as to clearly manifest an intention to include them in their operation.

2. Treaties ⬤⟳6—Rights of Indians under treaty authorizing passage across Canadian boundary held not annihilated by War of 1812.

Rights of Indians of the Six Nations under the Jay Treaty of 1794, authorizing passage over Canadian boundary line, held not annihilated by subsequent War of 1812 between the United States and England, without reference to article 9 of the Treaty of Ghent, recognizing and restoring the Indian status of the Jay Treaty.

3. Aliens ⬤⟳46—Member of Six Nations tribe residing in Canada held authorized to cross boundary to work as skilled structural iron worker.

Under article 3 of the Jay Treaty between Great Britain and the United States, authorizing passage across Canadian boundary, member of the Six Nations tribe residing in Canada held authorized to cross boundary line into the United States for purpose of engaging in work as a skilled structural iron worker.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Habeas corpus by the United States, on the relation of Paul Diabo, against John B. McCandless, Commissioner of Immigration for the Port of Philadelphia. Order granting the writ (18 F.[2d] 282), and respondent appeals. Affirmed.

George W. Coles, U. S. Atty., and Robert M. Anderson, Asst. U. S. Atty., both of Philadelphia, Pa., for appellant.

Adrian Bonnelly, of Philadelphia, Pa., for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. [1] In this habeas corpus case it appears that Paul Diabo, a full-blooded Indian of the Iroquois tribe, known as the Six Nations, was born on a reservation of that tribe in the Dominion of Canada. He first came to the United States in 1912, and from then on made a number of trips to and fro until 1925. These many trips were made by reason of the fact that he worked as a structural iron worker in putting up high buildings. About February 26, 1925, he was arrested on a warrant issued on complaint of the Commissioner of Immigration for the port of Philadelphia for an alleged violation of law in entering the United States without complying with the immigration laws. After hearing, he was by the immigration authorities ordered deported, whereupon he sued out in the court below this writ of habeas corpus.

No question of contagion, moral unfitness, or pauperism is in question, and, as stated in the government's brief, "the alien is personally unobjectionable, and no deliberate intention to violate the law has been established against him. Paul Diabo appears to be a skilled structural iron worker, constantly employed at a good salary; has a bank account and property in Canada." After hearing he was discharged from custody, whereupon this appeal was taken, and the question involved is whether the immigration laws of the United States apply to members of the tribe of the Six Nations born in Canada. Enlightened possibly by the status and relations of our own native Indians with reference to our own nation, we note that the unbroken line of decision has been that they stand separate and apart from the native-born citizen, that they are all wards of the nation, and that general acts of Congress do not apply to them, unless so worded as clearly to manifest an intention to include them in their operation. United States v. Rickert, 188 U. S. 432, 23 S. Ct. 478, 47 L. Ed. 532; Elk v. Wilkins, 112 U. S. 94, 5 S. Ct. 41, 28 L. Ed. 643. In Cherokee Nation v. Georgia, 5 Pet.

(30 U. S.) 17, 8 L. Ed. 25, Chief Justice Marshall said: "It may well be doubted whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations. They may, more correctly, perhaps, be denominated domestic dependent nations. They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession when their right of possession ceases. Meanwhile they are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian."

By article III of the Jay Treaty, made in 1794 between Great Britain and the United States, whereby the boundary line between the latter and Canada was fixed, it was provided:

"It is agreed that it shall at all times be free to his majesty's subjects, and to the citizens of the United States, and also to the Indians dwelling on either side of the said boundary line, freely to pass and repass by land or inland navigation, into the respective territories and countries of the two parties, on the continent of America (the country within the limits of the Hudson's Bay Company only excepted)."

The confederation of the Six Nations and the land held by it long preceded the Revolution. The proposed boundary line passed through this land. When the Revolution came, the Six Nations as a whole determined on neutrality, but left the constituent tribes to side with either party, which they did. Naturally the Six Nations resented the establishment of any boundary line through their territory which would restrict intercourse and free passage to their people, and remonstrance was made to the assumption of sovereignty over what they regarded, and then occupied, as their own. See Makers of Canada, vol. 3, p. 256. The situation was met by the two countries inserting the article quoted in the treaty. Evidently that article did not create the right of the Indian to pass over land actually in their possession, for, subject to the general dominant right of sovereignty claimed by all European nations based on discovery, the right of the Indian to possess the soil until he surrendered his right by sale or treaty has been recognized. In the case cited Chief Justice Marshall said: "The Indians are acknowledged to have an unquestionable, and heretofore unquestioned, right to the lands they occupy, until that right shall be extinguished by a voluntary cession to our Government."

Such being the historic relation of the Six Nations to the nations making the treaty, and the Indians not being parties thereto, it would seem clear that the quoted extract was not a temporary stipulation as to trade, commerce, mutual rights, and the like, but was in the nature of a modus vivendi, to be thereafter observed in the future by Canada and the United States in reference to the Indians. Two years later the provisions of this treaty were broadened by the Treaty of 1796, which provided:

"That no stipulations in any treaty subsequently concluded by either of the contracting parties with any other state or nation, or with any Indian tribe, can be understood to derogate in any manner from the rights of free intercourse and commerce, secured by the aforesaid third article of the treaty of amity, commerce and navigation, to the subjects of his majesty and to the citizens of the United States, and to the Indians dwelling on either side of the boundary line aforesaid; but that all the said persons shall remain at full liberty freely to pass and repass, by land or inland navigation, into the respective territories and countries of the contracting parties, on either side of the said boundary line, and freely to carry on trade and commerce with each other, according to the stipulations of the said third article of the treaty of amity, commerce and navigation."

[2] If this treaty, which as a treaty would have the force of law, is still in force, the petitioner cannot be deported for entering the country under the provisions thereof. But it is contended that, on the general principle that a war between nations subsequent to a treaty ends all prior treaty rights, all provisions of the Jay Treaty came to an end by reason of the War of 1812. But it will be observed that we are not here dealing with the rights and obligations of the two signatories to that treaty to and from each other, but with the rights of a third party created by the joint action of the signatories. While it may be contended that in the nature of things treaties and treaty rights end by war, and if they are to again exist it must be by a new treaty, this reasoning does not apply to these Indians. If through the War of 1812 the Six Nations remained neutral, as they had through the Revolutionary War, there was no reason why either of the contending nations in 1812 should desire to change the status of the Six Nations and thereby anger and drive them into hostilities. They had contended, when the Jay Treaty was being negotiated, that they should have free access to all

parts of their tribal territory by consent of both nations. And there was no reason why this right should come to an end because the two nations became involved in war, while they remained neutral. On the other hand, if any part of the Six Nations, as for example the Canadian tribe of which this petitioner is a member, took part against the United States, then the Treaty of Ghent, which in article 9 provided:

"The United States of America engage to put an end, immediately after the ratification of the present treaty, to hostilities with all the tribes or nations of Indians with whom they may be at war at the time of such ratification; and forthwith to restore to such tribes or nations, respectively, all the possessions, rights and privileges which they may have enjoyed or been entitled to in one thousand eight hundred and eleven, previous to such hostilities," recognized and restored the Indian status of the Jay Treaty. But, apart from this, we think the rights of these Indians under the Jay Treaty were not annihilated by the subsequent War of 1812. In Society v. New Haven, 8 Wheat. 492, 5 L. Ed. 662, the effect of this last war upon the Treaty of Peace of 1783 and the Jay Treaty of 1794 was involved; the court therein stating:

"The last question respects the effect of the late war between Great Britain and the United States upon rights existing under the treaty of peace. Under this head, it is contended by the defendant's counsel, that although the plaintiffs were protected by the treaty of peace, still, the effect of the last war was to put an end to that treaty, and, consequently, to civil rights derived under it, unless they had been revived and preserved by the Treaty of Ghent."

Discussing this question the court says: "But we are not inclined to admit the doctrine urged at the bar, that treaties become extinguished, ipso facto, by war between the two governments, unless they should be revived by an express or implied renewal on the return of peace. Whatever may be the latitude of doctrine laid down by elementary writers on the law of nations, dealing in general terms, in relation to this subject, we are satisfied, that the doctrine contended for is not universally true. There may be treaties of such a nature, as to their object and import, as that war will put an end to them; but where treaties contemplate a permanent arrangement of territorial, and other national rights, or which, in their terms, are meant to provide for the event of an intervening war, it would be against every principle of just interpretation, to hold them extinguished by the event of war. If such were the law, even the Treaty of 1783, so far as it fixed our limits, and acknowledged our independence, would be gone, and we should have had again to struggle for both upon original revolutionary principles. Such a construction was never asserted, and would be so monstrous as to supersede all reasoning.

"We think, therefore, that treaties stipulating for permanent rights, and general arrangements, and professing to aim at perpetuity, and to deal with the case of war as well as of peace, do not cease on the occurrence of war, but are, at most, only suspended while it lasts; and unless they are waived by the parties, or new and repugnant stipulations are made, they revive in their operation at the return of peace."

[3] If, therefore, the independence of the United States and the fixing of its boundaries as provided by treaty was not affected by its subsequent entry into war, on how much stronger ground and reason can it be contended that the independence of the Indian to pass the boundary line passing through his own tribal territory was not affected when Great Britain and America entered the War of 1812. Both Great Britain and the United States have resident in them the Indians of the Six Nations, both have reservations where members of this tribe live and toward them both countries hold the guardian relation pointed out by Chief Justice Marshall in words quoted above. So far as we are advised, neither Great Britain nor the Dominion of Canada have denied to the Indians of the Six Nations resident in the United States passage across the boundary line, and if the Jay Treaty is in force, as we find it to be, good faith and the observance of the treaty calls for the same course of conduct by the United States.

Finding no justification for the arrest and deportation of this man, the order of the court below discharging him is affirmed.