24 C.C.P.A.(Customs)

### UNITED STATES v. GARROW.
#### Customs Appeal No. 4018.

Court of Customs and Patent Appeals.
March 1, 1937.

Joseph R. Jackson, Asst. Atty. Gen. (Joseph E. Weil, Sp. Atty., of New York City, of counsel), for the United States.

George J. Moore, of Malone, N. Y., for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

Annie Garrow, a full-blooded Indian woman of the Canadian St. Regis Tribe of Iroquois Indians, and residing in Canada near the international boundary line, entered the United States at the village of Hogansburg, N. Y., carrying 24 baskets made of black ash splints and dyed in colors. The collector at the port imposed a duty under paragraph 411 of section 1 of the Tariff Act of 1930 (19 U.S.C.A. § 1001, par. 411), which provides: "Par. 411. Porch and window blinds, baskets, bags, chair seats, curtains, shades, or screens, any of the foregoing wholly or in chief value of bamboo, wood, straw, papier-mâché, palm leaf, or compositions of wood, not specially provided for, 50 per centum ad valorem."

The appellee protested, claiming her said baskets to be free of duty under the provisions of article 3 of the Treaty of Amity, Commerce, and Navigation concluded between the United States and Great Britain on November 19, 1794, commonly known as the Jay Treaty (8 Stat. 116, 117). Treaties, Conventions, International Acts, Protocols and Agreements between the United States and Other Powers, 1776–1909, by Malloy, vol. 1, p. 590, Senate Document No. 357, 61st Congress, 2d Session.

The material portions of the protest filed are as follows:

"Sir: Notice of dissatisfaction is hereby given with, and protest is hereby made against your ascertainment, assessment, and liquidation of duties (including the legality of all orders and findings entering into the same), on the entry below named. The reasons for objection are as follows:

"Article 3 of the Treaty of Amity, Commerce, and Navigation, concluded between the United States and Great Britain on November 19, 1794, known as the Jay Treaty, reads in part as follows:

" 'No duty of entry shall ever be levied by either party on peltries brought by land, or inland navigation into the said ter-

ritories respectively, nor shall the Indians passing or repassing with their own proper goods and effects of whatever nature, pay for the same any impost or duty whatever. But goods in bales, or other large packages, unusual among Indians, shall not be considered as goods belonging bona fide to Indians.'

"This provision was in substance carried into the various tariff acts enacted during the period from March 2, 1799, to August 28, 1894.

"The provision was repealed in the latter act of section 34 of the Act of July 24, 1897 [30 Stat. 213], together with all the acts, or parts of acts inconsistent with the repealing statute.

"The repeal of the provision, in effect, abrogated that portion of the treaty, above indicated, but as the repeal was inconsistent with the terms of the treaty, the legality of the repeal is questionable."

Upon a hearing before the United States Customs Court, in addition to the facts hereinbefore stated, it also appeared that at the time the international line was established between the Dominion of Canada and the United States of America, this line ran through the territory theretofore occupied by the St. Regis Tribe, with the result that a large number of this tribe reside on the American side and the rest of the tribe on the Canadian side, and that intercourse and communication between these portions of the tribe are continuous. It also appears that for some years the protestant, together with many others of her tribe, have been manufacturing baskets such as those in question here, for sale wherever they could be disposed of; that the protestant, on the occasion of the importation in question, was bringing the baskets across the line to dispose of them at the store of one McKinnon, who was in the business of purchasing such baskets from the Indians for resale; and that the amount received by the protestant for her baskets was $2, one-half of which was paid for duty imposed. It is also shown that the protestant was not carrying these baskets as a part of her household effects, but had manufactured the same, and was importing them, for sale in the United States. As the baskets were brought into the United States they were in two bundles, twelve in a bundle; the baskets in each bundle being fastened together by loops through their respective handles. Each basket was about six inches wide and about 8 inches high. As fastened together, they fitted into each other and made compact bundles which could be easily carried.

The United States Customs Court sustained the protest, holding that the case was controlled by McCandless v. United States, 25 F.(2d) 71, a decision of the Circuit Court of Appeals for the Third Circuit. The Government brings the matter here by appeal, and contends that the court below was in error for three specific reasons which are specified in the Government's brief as follows:

"(1) Article 3 of the Jay Treaty of 1794 was annulled by the War of 1812.

"(2) Alternatively, if article 3 of the Jay Treaty was not abrogated by the War of 1812, it is, nevertheless, in conflict with a subsequent statute. It is well settled that when a Treaty and a Statute are in conflict, that which is later in date prevails.

"(3) Assuming, for the sake of argument, that article 3 was not abrogated but is still in force and effect, the importation is not within the purview of the language of said article 3."

On the other hand, counsel for the appellee contends that article 3 of the Jay Treaty of 1794 is still in full force and effect, and that under this treaty the imported goods are free of duty. The claim is thus stated: "The appellee's claim is that article 3 of the Jay Treaty of 1794, at least insofar as it applies to bona fide Indians, is still in effect and the merchandise in question is free from duty."

It will be necessary to examine the provisions of the involved treaty, and the legislation and history of the times since the ratification of the Jay Treaty, in order to come to a proper conclusion as to the claims of the appellee to exemption from duty.

The Jay Treaty of 1794, in article 3 thereof, contained the following provisions:

"It is agreed that it shall at all times be free to his Majesty's subjects, and to the citizens of the United States, and also to the Indians dwelling on either side of the said boundary line, freely to pass and repass by land or inland navigation, into the respective territories and countries of the two parties, on the continent of America (the country within the limits of the Hudson's bay Company only excepted) and to navigate all the lakes, rivers and waters thereof, and freely to carry on trade and commerce with each other. * * *

"No duty of entry shall ever be levied by either party on peltries brought by land, or inland navigation into the said territories respectively, nor shall the Indians passing or repassing with their own proper goods and effects of whatever nature, pay for the same any impost or duty whatever. But goods in bales, or other large packages, unusual among Indians, shall not be considered as goods belonging bona fide to Indians."

It will be observed that the quoted provisions are self-executing and granted to the Indians named therein the right to bring their own proper goods and effects of whatever nature into the United States immediately upon the ratification of the treaty, without legislation. However, irrespective of this, the Congress of the United States, in an act to regulate the collection of duties on imports and tonnage, enacted March 2, 1799 (1 Stat. 627), provided in section 105 thereof (page 702) as follows: "Sec. 105. *And be it further enacted,* That no duty shall be levied or collected on the importation of peltries brought into the territories of the United States, nor on the proper goods and effects of whatever nature, of Indians passing, or repassing the boundary line aforesaid, unless the same be goods in bales or other large packages unusual among Indians, which shall not be considered as goods belonging bona fide to Indians, nor be entitled to the exemption from duty aforesaid."

This was the situation of affairs at the time of the declaration of war between the United States and Great Britain on June 18, 1812. This war was concluded by the Treaty of Peace made at Ghent on December 24, 1814, and ratified February 17, 1815 (8 Stat. 218). See Malloy's Treaties, Conventions, etc., supra, pp. 612–620. Article 9 of said treaty (8 Stat. 222) contained the following provision, among others: "The United States of America engage to put an end, immediately after the ratification of the present treaty, to hostilities with all the tribes or nations of Indians with whom they may be at war at the time of such ratification; and forthwith to restore to such tribes or nations, respectively, all the possessions, rights, and privileges, which they may have enjoyed or been entitled to in one thousand eight hundred and eleven, previous to such hostilities."

Following the Treaty of Ghent, the Congress, on various occasions, enacted legislation dealing with duties on imports into the United States. A citation of some of these acts is given in a marginal note.*

These various acts were not express repeals of the preceding acts, but usually were amendatory thereof, and in most cases were introduced with the phraseology, "The duties heretofore laid by law, on goods, wares and merchandise, imported into the United States, shall cease and determine, and there shall be levied, and collected, and paid, the several duties hereinafter mentioned," or similar language.

The Congress, in the first session of the 43d Congress of 1873–1874, caused to be issued, as a part of the Statutes at Large, a volume entitled "Revised Statutes of the United States." Herein was incorporated substantially the provision hereinbefore quoted from the statute of March 2, 1799, as section 2515. The section follows: "Sec. 2515. That no duty shall be levied or collected on the importation of

---

* An act to regulate the duties on imports and tonnage, of April 27, 1816, 3 Stat. chap. 107, p. 310.

An act in alteration of the several acts imposing duties on imports, of May 19, 1828, 4 Stat. chap. 55, p. 270.

An act to alter and amend the several acts imposing duties on imports, of July 14, 1832, 4 Stat. chap. 227, p. 583.

An act to provide revenue from imports, and to change and modify existing laws imposing duties on imports, and for other purposes, of August 30, 1842, 5 Stat. chap. 270, p. 548.

An act reducing the duty on imports, and for other purposes, of July 30, 1846, 9 Stat. chap. 74, p. 42.

An act to provide for the payment of outstanding Treasury notes, to authorize a loan, to regulate and fix the duties on imports, and for other purposes, of March 2, 1861, 12 Stat. chap. 68, p. 178.

An act to provide increased revenue from imports, to pay interest on the public debt, and for other purposes, of August 5, 1861, 12 Stat. chap. 45, p. 292.

An act to increase the duties on tea, coffee, and sugar, of Dec. 24, 1861, 12 Stat. chap. 2, p. 330.

An act to increase duties on imports, and for other purposes, of June 30, 1864, 13 Stat. chap. 171, p. 202.

An act to reduce internal taxes, and for other purposes, of July 14, 1870, 16 Stat. chap. 255, p. 256.

An act to reduce duties on imports, and to reduce internal taxes, and for other purposes, of June 6, 1872, 17 Stat. chap. 315, p. 230.

peltries brought into the Territories of the United States, nor on the proper goods and effects, of whatever nature, of Indians passing or repassing the boundary-line aforesaid, unless the same be goods in bales or other large packages unusual among Indians, which shall not be considered as goods belonging to Indians, nor be entitled to the exemption from duty aforesaid."

In the revision of 1878, the same section was repeated.

It is significant that in a marginal note, printed in connection with section 2515, both in the Revised Statutes of 1873–1874 and 1878, the compiler refers to the statute of March 2, 1799, heretofore referred to.

This condition continued until, in the Tariff Act of March 3, 1883, 22 Stat. chap. 121, p. 488, a section known as section 2512 was incorporated, which is, in substance and effect, similar to the provision of the statute of 1799, heretofore quoted.

Again, in paragraph 674 of section 2 of the Tariff Act of October 1, 1890, 26 Stat. chap. 1244, pp. 567, 602, 608, this provision was made: "674. Peltries and other usual goods and effects of Indians passing or repassing the boundary line of the United States, under such regulations as the Secretary of the Treasury may prescribe: Provided, That this exemption shall not apply to goods in bales or other packages unusual among Indians."

Exactly the same provision was repeated in the tariff revision of August 27, 1894, par. 582, § 2, 28 Stat. chap. 349, pp. 509, 536, 543.

The next general revision of the tariff act was that of July 24, 1897, 30 Stat. chap. 11, p. 151. The provision which had been carried in the three preceding acts, as to the goods of Indians passing and repassing, was omitted from the said Tariff Act of July 24, 1897, and no reference has been made to this provision in any succeeding act. However, in not only the said act of 1897, but in succeeding acts, duties have been imposed upon goods similar to those which were imported in this case.

In the said Tariff Act of July 24, 1897, appeared section 34 (30 Stat. 213). The following portion of said section is material here, and is as follows: "Sec. 34. That sections one to twenty-four, both inclusive, of an Act entitled 'An Act to reduce taxation, to provide revenue for the Government, and for other purposes,' which became a law on the twenty-eighth day of August, eighteen hundred and ninety-four, and all acts and parts of acts inconsistent with the provisions of this Act are hereby repealed, said repeal to take effect on and after the passage of this Act."

The quoted provisions of article 3 of the Jay Treaty of 1794 were, as we have heretofore stated, self-executing. The Act of March 2, 1799, § 105, was therefore not requisite to give the provisions of said article 3 full force and effect, but was only confirmatory of the rights granted by said treaty.

The trial court relied strongly upon McCandless v. United States, supra, decided March 9, 1928. In that case, which involved a writ of habeas corpus, a full-blooded Indian of the Iroquois Tribe, born in Canada, crossed the border line from Canada and was arrested on complaint of the Commissioner of Immigration for an alleged violation of law in entering the United States without complying with the immigration laws. He was ordered deported, whereupon he sued out a writ of habeas corpus. The United States District Court granted the writ and discharged the petitioner. The Circuit Court, speaking through Buffington, Circuit Judge, affirmed the order of discharge, holding that the general acts of Congress did not apply to members of the Indian tribes. Article 3 of the Jay Treaty was brought into question and was discussed at length. The court held that the declaration of the War of 1812 did not end the treaty rights secured to the Indians through the said Jay Treaty, so long as they remained neutral. Finally the court held that the rights granted by said article 3 were permanent, and were, at most, only suspended during the existence of the War of 1812. Therefore, it was held that the petitioner might pass and repass freely, under and by virtue of the provisions of said article 3. This case was not appealed to the Supreme Court. This may have been occasioned by the fact that on April 2, 1928, an act of Congress was approved which provided that the Immigration Act of 1924 should not apply to Indians crossing the international border (45 Stat. 401 [8 U.S.C.A. § 226a]).

In 1929, the case of Karnuth, Director of Immigration, et al. v. United States, on petition of Albro, 279 U.S. 231, 49 S.Ct. 274, 276, 73 L.Ed. 677, came before the Supreme Court, and was decided. A writ of habeas corpus had been sued out on be-

half of two aliens who were detained by immigration officials, and who had entered this country from Canada. The respondent Mary Cook was a British subject, born in Scotland, who came to Canada in 1924. The respondent Antonio Danelon was a native of Italy who came to Canada in 1923. These persons resided at Niagara Falls, Ontario. The latter claimed to be a Canadian citizen, by reason of his father's naturalization. Both respondents had been crossing back and forth over the boundary line, in pursuance of employment in the United States, for a considerable period before their detention. The Federal District Court sustained the action of the immigration officials and dismissed the writ. This judgment, on appeal, was reversed by the Circuit Court of Appeals, which held that if the statute were so construed as to exclude the aliens in question, it would conflict with article 3 of the Jay Treaty of 1794. Certiorari was granted and the case came before the Supreme Court. That court referred to the hereinbefore quoted provisions of said article 3 of the Jay Treaty. The contention made by government counsel was that the treaty provision relied on was abrogated by the War of 1812, and it was upon this point that the case was decided. The court, speaking through Mr. Justice Sutherland, expressed the views that the doctrine that war ipso facto annuls treaties of every kind between the warring nations was repudiated by the great weight of modern authority, and that whether the stipulations of a treaty are annulled by war depends upon their intrinsic character. The court cites, as instances of treaty obligations which remain in force during the state of war, such treaties as those of "cession, boundary, and the like; provisions giving the right to citizens or subjects of one of the high contracting powers to continue to hold and transmit land in the territory of the other; and, generally, provisions which represent completed acts." On the other hand, the court held that treaties of "amity, of alliance, and the like, having a political character, the object of which 'is to promote relations of harmony between nation and nation,' are generally regarded as belonging to the class of treaty stipulations that are absolutely annulled by war." Pursuing the matter further, the Supreme Court said, in part:

"These cases are cited by respondents and relied upon as determinative of the effect of the War of 1812 upon article 3 of the treaty. This view we are unable to accept. Article 9 and article 3 relate to fundamentally different things. Article 9 aims at perpetuity, and deals with existing rights, vested and permanent in character, in respect of which, by express provision, neither the owners nor their heirs or assigns are to be regarded as aliens. These are rights which, by their very nature, are fixed and continuing, regardless of war or peace. But the privilege accorded by article 3 is one created by the treaty, having no obligatory existence apart from that instrument, dictated by considerations of mutual trust and confidence, and resting upon the presumption that the privilege will not be exercised to unneighborly ends. It is, in no sense, a vested right. It is not permanent in its nature. It is wholly promissory and prospective, and necessarily ceases to operate in a state of war, since the passing and repassing of citizens or subjects of one sovereignty into the territory of another is inconsistent with a condition of hostility. See 7 Moore's Digest of International Law, § 1135; 2 Hyde, International Law, § 606. The reasons for the conclusion are obvious—among them, that otherwise the door would be open for treasonable intercourse. And it is easy to see that such freedom of intercourse also may be incompatible with conditions following the termination of the war. Disturbance of peaceful relations between countries occasioned by war is often so profound that the accompanying bitterness, distrust, and hate indefinitely survive the coming of peace. The causes, conduct, or result of the war may be such as to render a revival of the privilege inconsistent with a new or altered state of affairs. The grant of the privilege connotes the existence of normal peaceful relations. When these are broken by war, it is wholly problematic whether the ensuing peace will be of such character as to justify the neighborly freedom of intercourse which prevailed before the rupture. It follows that the provision belongs to the class of treaties which does not survive war between the high contracting parties, in respect of which, we quote, as apposite, the words of a careful writer on the subject.
* * *

"These expressions and others of similar import which might be added, confirm our conclusion that the provision of the Jay Treaty now under consideration was brought to an end by the War of 1812,

leaving the contracting powers discharged from all obligation in respect thereto, and, in the absence of a renewal, free to deal with the matter as their views of national policy, respectively, might from time to time dictate."

Finally, the judgment of the Circuit Court of Appeals was reversed, and the action of the Commissioner of Immigration was sustained.

The view of the Supreme Court on this interesting question, expressed in the case last cited, was confirmatory of views held by that court from the initiation of our government. See Society for Propagation of Gospel in Foreign Parts v. Town of New Haven and William Wheeler, 8 Wheat. 464, 494, 5 L.Ed. 662.

It was also obviously in conformity with the current of authority both in the United States and England. Moore's International Law Digest, vol. 5, par. 779.

██ It is contended by the appellee that some distinction should be made between the members of an Indian tribe and the immigrants in the Karnuth Case, supra. We know of no authority which states or indicates that any such distinction exists, especially as to Indians domiciled in a foreign country. There is no such line of demarcation indicated in the opinion of Mr. Justice Sutherland, hereinbefore quoted. If article 3 of the Jay Treaty was nullified by the War of 1812, as to Canadian citizens or subjects, it certainly was nullified, so far as Indians residing in Canada were concerned, for, although wards of the Canadian government, they were certainly within the category of citizens or subjects.

We think, therefore, it must be said that so far as the provision under which the appellee here claims is concerned, the War of 1812 ended the right which the appellee now claims of bringing her goods across the border and into the United States without the payment of duty.

However, the War of 1812 did not annul or repeal the Tariff Act of March 2, 1799, which was still in full force and effect during the entire period of the duration of the war.

The Treaty of Ghent of 1814, article 9, as it will be observed, was not self-executing. It constituted a contract on the part of the United States of America that it would, by the necessary legislation, "restore to such tribes or nations, respectively, all the possessions, rights, and privileges, which they may have enjoyed or been entitled to in one thousand eight hundred and eleven, previous to such hostilities."

So far as we are advised, no such ratifying legislation was ever enacted. Presumably it was not thought necessary to do so, so far as Indian rights are concerned, as at that time the cited provision in the Tariff Act of March 2, 1799, was in full force and effect, and had been so since its enactment.

Evidently, in the congressional enactments known as the Revised Statutes of 1873–1874 and 1878, Congress still considered said Act of March 2, 1799, in full force and effect. It was so noted in marginal notes, and was considered as a part of the statutory law of the land at those times.

The Congress, as has been stated, reenacted the said provision of the Act of March 2, 1799, in the Tariff Act of March 3, 1883, in section 2512 thereof. In the Tariff Act of October 1, 1890, § 2, par. 674, a re-enactment of this provision was made with changed language; that is, instead of permitting the free entry of peltries of every kind, the language implies that only peltries of Indians should be admitted free of duty, and then under such regulation as the Secretary of the Treasury should prescribe. This was also the purport of the revision of August 27, 1894, § 2, par. 582.

Thus far the rights of the Indians of Canada to bring their peltries and goods into the United States free of duty were, if we concede the facts and conclusions hereinbefore stated, granted by statute and not by treaty, at least after the declaration of the War of 1812.

In 1897, when a general revision of the import duty laws of the United States was undertaken, apparently there was a change in congressional policy, as the provision for the free entry of peltries and goods of Indians was omitted from that revision, and duties were generally imposed by various provisions of said act upon the goods herein involved.

██ As will be noted by the hereinbefore quoted portion of section 34 of the Tariff Act of July 24, 1897, said section expressly repealed certain of the provisions of the tariff act of August 28, 1894, and added this in the repealing act: " * * * all acts and parts of acts inconsistent with the provisions of this Act."

In the protest of the appellee, it will be noted that appellee concedes that said section 34 repealed the hereinbefore mentioned provisions of the Tariff Acts of March 2, 1799, and of August 27, 1894. Irrespective of this concession, it must be manifest that such was the legal effect of said section 34 of the Act of July 24, 1897.

At the time of the entry of the goods here in question, therefore, there was no provision of the law exempting the said goods of the appellee from duty, but in fact they were especially made dutiable under paragraph 411 of section 1 of the Tariff Act of 1930, as hereinbefore indicated. There being neither any treaty exemption of appellee's goods from duty, nor any statutory exemption thereof, it follows that they are dutiable, as claimed by the collector.

This being our conclusion, it is unnecessary to decide the other points presented by counsel for the government.

The judgment of the United States Customs Court is therefore reversed.

Reversed.