**Andrew AKINS**

v.

**The UNITED STATES.**

**Custom Appeal No. 76–12.**

United States Court of Customs and Patent Appeals.

March 31, 1977.

David C. Crosby, Thomas N. Tureen, Barry A. Margolin, Dennis M. Montgomery, Calais, Maine, attys. of record, for appellant.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C., David M. Cohen, Acting Chief, Customs Section, Velta A. Melnbrencis, New York City, attys. of record, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Associate Judges.

BALDWIN, Judge.

This is an appeal by the importer (Akins) from a judgment of the Customs Court, C.D. 4629, 407 F.Supp. 748, 76 Cust.Ct. 15 (1976), denying his motion for summary judgment and granting the appellee's cross-motion for summary judgment. We affirm.

On July 16, 1974, the appellant, carrying a pair of hiking boots which he had purchased in Canada, entered the United States at the Calais, Maine border station. A customs official assessed a duty of $1.20 on appellant's boots, pursuant to item 700.-45, Tariff Schedules of the United States (TSUS).[1] As a Penobscot Indian, Akins claimed an exemption under Article III of the Treaty of Amity, Commerce and Navigation, with His Britannic Majesty, November 19, 1794, 8 Stat. 116, 117 (commonly known as the Jay Treaty) from paying customs duty on goods for his personal use.[2]

1. Schedule 7.—SPECIFIED PRODUCTS: MISCELLANEOUS AND NON-ENUMERATED PRODUCTS

Part 1.—Footwear; * * *

* * * * * *

Subpart A.—Footwear

* * * * * *

Footwear, of leather (except footwear with uppers of fibers):

Other:

* * * * * *

For other persons:

* * * * * *

Other:

* * * * * *

Item
700.45    Valued over $2.50 per pair .. 12% ad val.

2. Article III of the Jay Treaty provides in part:

It is agreed that it shall at all times be free to his Majesty's subjects, and to the citizens of the United States, and also to the Indians dwelling on either side of the said boundary line, freely to pass and repass by land or inland navigation, into the respective territories and countries of the two parties, on the continent of America (the country within the limits of the Hudson's bay Company only excepted) and to navigate all the lakes, rivers and waters thereof, and freely to carry on trade and commerce with each other. But it is understood, that this article does not extend to the admission of vessels of the United States into the sea-ports, harbours, bays, or creeks of his Majesty's said territories; nor into such parts of the rivers in his Majesty's said territories as are between the mouth thereof, and the highest port of entry from the sea, except in small vessels trading bona fide between Montreal and Quebec, under such regulations as shall be established to prevent the possibility of any frauds in this respect. Nor to the admission of British vessels from the sea into the rivers of the United States, beyond the highest ports of entry for foreign vessels from the sea. The river Mississippi shall, however, according to the treaty of peace, be entirely open to both parties; and it is further agreed, that all the ports and places on its eastern side, to whichsoever of the parties belonging, may freely be resorted to and used by both parties, in as ample a manner as any of the Atlantic ports or places of the United States, or any of the ports or places of his Majesty in Great-Britain.

All goods and merchandize whose importation into his Majesty's said territories in America, shall not be entirely prohibited, may freely, for the purposes of commerce, be carried into the same in the manner aforesaid, by the citizens of the United States, and such goods and merchandize shall be subject to no higher or other duties, than would be payable by his Majesty's subjects on the importation of the same from Europe into the said territories. And in like manner, all goods and merchandize whose importation into the United States shall not be wholly prohibited, may freely, for the purposes of

The Customs Court, relying on *Karnuth v. United States ex rel. Albro,* 279 U.S. 231, 49 S.Ct. 274, 73 L.Ed. 677 (1929), and *United States v. Garrow,* T.D. 48, 208, 88 F.2d 318, 24 CCPA 410, *cert. denied,* 302 U.S. 695, 58 S.Ct. 14, 82 L.Ed. 537 (1937), held that the provisions of Article III of the Jay Treaty relied on by the appellant had been abrogated by the War of 1812. In addition, the Customs Court considered Congressional intent and noted that subsequent to the signing of the Jay Treaty and prior to the War of 1812, a provision closely patterned after the duty exemption of Article III was included in the Tariff Act of 1799, ch. XXII, 1 Stat. 627.[3] A provision, substantially the same, continued in tariff acts for 100 years. However, the repeal of the statutory exemption in 1897 and specific inclusion of personal goods in tariff acts thereafter, convinced the lower court that the personal privilege originally granted by Article III of the Jay Treaty had been nullified.

### Historical Background

From 1675 to 1850 the Penobscot Tribe was formally banded together with several other tribes in the Wabanaki Confederacy whose territorial claims included an area extending over present day Nova Scotia to the present western boundary of Maine. Tribal members were free to travel and trade within that area without question until the time of the American Revolution.[4] At the conclusion of the Revolutionary War, a boundary line was established between the United States and what is now Canada, dividing the confederated tribes' territory. In 1794 Great Britain and the United States adopted the Jay Treaty, which protected, in Article III, the free passage rights of the Indians to cross the new boundary. In addition, a duty exemption was provided to Indians for "their own proper goods and effects of whatever nature." Large packages or bales of goods were not excluded from the duty. Article XXVIII[5] of the same treaty specifically made the first ten articles permanent, although the Supreme Court later explained in *Karnuth,* supra 279 U.S. at 242, 49 S.Ct. at 278:

[T]he word "permanent" * * * was not employed as a synonym for "perpetual" or "everlasting," but in the sense that those [the first ten] articles were not limited to a specific period of time, as was the case in respect of the remaining articles.

*And be it further enacted,* That no duty shall be levied or collected on the importation of peltries brought into the territories of the United States, nor on the proper goods and effects of whatever nature, of Indians passing, or repassing the boundary line aforesaid, unless the same be goods in bales or other large packages unusual among Indians, which shall not be considered as goods belonging bona fide to Indians, nor be entitled to the exemption from duty aforesaid [1 Stat. 702.]

commerce, be carried into the same, in the manner aforesaid, by his Majesty's subjects, and such goods and merchandize shall be subject to no higher or other duties, than would be payable by the citizens of the United States on the importation of the same in American vessels into the Atlantic ports of the said states. And all goods not prohibited to be exported from the said territories respectively, may in like manner be carried out of the same by the two parties respectively, paying duty as aforesaid.

No duty of entry shall ever be levied by either party on peltries brought by land, or inland navigation into the said territories respectively, nor shall the Indians passing or repassing with their own proper goods and effects of whatever nature, pay for the same any impost or duty whatever. But goods in bales, or other large packages, unusual among Indians, shall not be considered as goods belonging bona fide to Indians. [8 Stat. 117–18.]

3. Section 105 of the Tariff Act of 1799 provides in pertinent part:

4. Members of the Penobscot Tribe fought on the side of the United States during the Revolutionary War, but the confederacy as a whole remained neutral.

5. The Jay Treaty, November 19, 1794, 8 Stat. 116, 129; Article XXVIII provides in part:

It is agreed, that the first ten articles of this treaty shall be permanent * * *. But if it should unfortunately happen, that his Majesty and the United States should not be able to agree on such new arrangements, in that case, all the articles of this treaty, except the first ten, shall then cease and expire together.

In 1796 an Explanatory Article was also adopted by the United States and Great Britain in which the parties unequivocally affirmed their continued recognition of the Jay Treaty "free intercourse and commerce" rights.[6] The article was directed toward potentially conflicting provisions of treaties concluded in the interim by either party with any other state, nation, or Indian tribe.

Although the Jay Treaty, upon ratification, was self-executing, and, therefore, the provisions of Article III were effective without legislation, Congress enacted section 105 of the Tariff Act of 1799 to provide an express duty exemption for Indians.[7] The pertinent language of that provision was patterned closely after the duty-free provision of Article III.[8] The duty exemption for Indians, provided in the Jay Treaty,

was thus confirmed by Congressional mandate.

On June 12, 1812, war between the United States and Great Britain was declared. The war was a direct threat to the rights and privileges established by the Jay Treaty, the signatories being the warring parties. Following the war, both parties ratified the Treaty of Peace and Amity, December 24, 1814, 8 Stat. 218 (1815) (commonly known as the Treaty of Ghent). In Article Nine[9] the United States purported to restore to the Indian tribes and nations which were hostile to the United States all the possessions, rights, and privileges to which the tribes and nations were entitled before the war. There is conflict, however, whether Article Nine was self-executing.[10] No implementing legislation was ever enacted.[11]

---

6. Explanatory Article of May 4, 1796, 8 Stat. 130, provides in part:

   * * * That no stipulations in any treaty subsequently concluded by either of the contracting parties with any other state or nation, or with any Indian tribe, can be understood to derogate in any manner from the rights of free intercourse and commerce, secured by the aforesaid third article of the treaty of amity, commerce and navigation, to the subjects of his Majesty and to the citizens of the United States, and to the Indians dwelling on either side of the boundary line aforesaid; but that all the said persons shall remain at full liberty freely to pass and repass by land or inland navigation, into the respective territories and countries of the contracting parties, on either side of said boundary line, and freely to carry on trade and commerce with each other, according to the stipulations of the said third article of the treaty of amity, commerce and navigation. [8 Stat. 130–31.]

7. Note 3, supra.

8. Compare section 105 of the Tariff Act of 1799 (note 3) with the relevant section of Article III (last paragraph of note 2). Section 104 of the Tariff Act of 1799 states one of the purposes of the act, "[c]onforming this act to certain stipulations contained in treaties made and ratified under the authority of the United States * * *." [1 Stat. 701.]

9. Treaty of Ghent, December 24, 1814, 8 Stat. 218 (1815), provides in pertinent part:

   ARTICLE THE NINTH.

   The United States of America engage to put an end, immediately after the ratification of the present treaty, to hostilities with all

the tribes or nations of Indians with whom they may be at war at the time of such ratification; and forthwith to restore to such tribes or nations, respectively, all the possessions, rights, and privileges, which they may have enjoyed or been entitled to in one thousand eight hundred and eleven, previous to such hostilities: *Provided always,* That such tribes or nations shall agree to desist from all hostilities, against the United States of America, their citizens and subjects, upon the ratification of the present treaty being notified to such tribes or nations, and shall so desist accordingly. And his Britannic majesty engages, on his part, to put an end immediately after the ratification of the present treaty, to hostilities with all the tribes or nations of Indians with whom he may be at war at the time of such ratification, and forthwith to restore to such tribes or nations, respectively, all the possessions, rights, and privileges, which they may have enjoyed or been entitled to, in one thousand eight hundred and eleven, previous to such hostilities: * * *. [8 Stat. 222–23.]

10. The *Garrow* court opined that the Treaty of Ghent was not self-executing. 88 F.2d at 323, 24 CCPA at 418. *Compare Garrow with McCandless v. United States ex rel. Diabo,* 25 F.2d 71, 73 (CA3 1928); and *United States ex rel. Goodwin v. Karnuth,* 74 F.Supp. 660, 662 (W.D.N.Y.1947). But Akins argues that his rights are not affected by Article IX of the Treaty of Ghent because the Penobscot Tribe did not take part in the hostilities.

11. *Garrow,* 88 F.2d at 323, 24 CCPA at 418.

After the War of 1812, Congress continued to include that Indian duty exemption contained in section 105 of the Tariff Act of 1799 in subsequent tariff legislation until 1897. In the 1873–1874 Session, Congress enacted the Revised Statutes of the United States in which section 2515 of the revision incorporated the language of section 105. In 1878, section 2515 was repeated with a marginal note referring to the Tariff Act of 1799. An Act of March 3, 1883, ch. 121, § 2512, 22 Stat. 488, 523, included substantially the same language.

An amendment to the provision was made in the Tariff Act of 1890, ch. 1244, 26 Stat. 567. It provided:

> 674. Peltries and other usual goods and effects of Indians passing or repassing the boundary line of the United States, under such regulations as the Secretary of the Treasury may prescribe: *Provided,* That this exemption shall not apply to goods in bales or other packages unusual among Indians. [26 Stat. 608.]

The same language was incorporated in the Tariff Act of 1894, ch. 349, § 2, para. 582, 28 Stat. 509, 543. The Tariff Act of 1897, ch. 11, § 34, 30 Stat. 151, 213, repealed, inter alia, paragraph 582, above noted, and all other acts and parts of acts inconsistent with the provisions of the Tariff Act of 1897.

To summarize, language substantially identical to that of Article III of the Jay Treaty was continuously reenacted by Congress in tariff acts until 1897. Since 1897, no such exemption has been provided by statutes and duties have been enforced by customs officials. The historical and statutory developments since the ratification of the Jay Treaty are substantial. Their effect on Article III is discussed in several cases.

*McCandless v. United States ex rel. Diabo,* 25 F.2d 71 (CA3 1928), involved a Canadian-born, full-blooded, Iroquois Indian whom the Department of Labor sought to deport for his failure to comply with the Immigration Act of 1924, ch. 190, 43 Stat. 153. During the course of his employment, the appellant regularly crossed the Canadian border. He claimed he was exercising his right to pass and repass which was protected by Article III of the Jay Treaty. The Third Circuit agreed, holding that the right to pass and repass provided in Article III was permanent and vested. The court concluded that the Jay Treaty was only suspended and not abrogated by the War of 1812. It cited *Society for the Propagation of the Gospel v. New Haven,* 21 U.S. (8 Wheat.) 206, 219, 5 L.Ed. 662 (1823), in which the Court stated:

> But we are not inclined to admit the doctrine urged at the bar, that treaties become extinguished, *ipso facto,* by war between the two governments, unless they should be revived by an express or implied renewal on the return of peace. Whatever may be the latitude of doctrine laid down by elementary writers on the law of nations, dealing in general terms, in relation to this subject, we are satisfied, that the doctrine contended for is not universally true. There may be treaties of such a nature, as to their object and import, as that war will put an end to them; but where treaties contemplate a permanent arrangement of territorial, and other national rights, or which, in their terms, are meant to provide for the event of an intervening war, it would be against every principle of just interpretation, to hold them extinguished by the event of war. If such were the law, even the treaty of 1783, so far as it fixed our limits, and acknowledged our independence, would be gone, and we should have had again to struggle for both upon original revolutionary principles. Such a construction was never asserted, and would be so monstrous as to supersede all reasoning. We think, therefore, that treaties stipulating for permanent rights, and general arrangements, and professing to aim at perpetuity, and to deal with the case of war as well as of peace, do not cease on the occurrence of war, but are, at most, only suspended while it lasts * * *.

The Supreme Court held that Article IX of the Jay Treaty [12] created vested property rights and stated that treaty rights of this nature were not abrogated by war.

In *Karnuth, supra,* the Supreme Court drew a distinction between vested property rights and mere privileges in the context of Article III of the Jay Treaty and employed a rationale different from *McCandless. Karnuth* involved two Canadian residents (not Indians) who were denied entry into the United States because they had been classified as quota immigrants rather than tourists.[13] They argued that Article III of the Jay Treaty permitted them to pass and to repass freely. After reviewing *New Haven,* on which the Third Circuit based its holding in *McCandless,* the Court distinguished between the rights guaranteed by Article IX [14] and those enumerated in Article III.[15] The Court stated that Article IX was concerned with permanently vested property rights, whereas, Article III was concerned with rights which were *created* by the treaty with "no obligatory existence apart from that instrument." With regard to this issue, it concluded that the continuance of the Article III right of free passage would be inconsistent with a state of hostility, and that its revival after the War of 1812 might also conflict "with a new or altered state of affairs." 279 U.S. at 239, 49 S.Ct. at 277.

The Court further stated that:

[T]he provision [Article III right of free passage] of the Jay Treaty now under consideration was brought to an end by the War of 1812, leaving the contracting powers discharged from all obligation in respect thereto, and, in the absence of a renewal, free to deal with the matter as their views of national policy, respectively, might from time to time dictate. [279 U.S. at 241, 49 S.Ct. at 278.]

In contrast to *McCandless* and *Karnuth* which were concerned with the *passage* provision of Article III, *Garrow, supra,* concerned the *duty* provisions of Article III. *Garrow* involved an Indian who brought baskets from Canada, where she lived, to the United States. Pursuant to paragraph 411 of section 1 of the 1930 Tariff Act, a duty was imposed on the baskets. This court applied the rationale of the Supreme Court in *Karnuth* to the duty exemption of Article III and held that the War of 1812 nullified Article III. As a result, the duty exemption was lost to citizens and subjects of Canada, including the Indians. On this point, the court stated:

It is contended by the appellee that some distinction should be made between the members of an Indian tribe and the immigrants in the *Karnuth* case, *supra.* We know of no authority which states or indicates that any such distinction exists, especially as to Indians domiciled in a foreign country. There is no such line of demarcation indicated in the opinion of Mr. Justice Sutherland, hereinbefore quoted. If Article III of the Jay Treaty was nullified by the War of 1812, as to Canadian citizens or subjects, it certainly was nullified, so far as Indians residing in Canada were concerned, for, although wards of the Canadian government, they were certainly within the category of citizens or subjects.

We think, therefore, it must be said that so far as the provision under which

legal remedies incident thereto, be regarded as aliens.

---

**12.** November 19, 1794, 8 Stat. 116, 122.

ARTICLE IX.

It is agreed that British subjects who now hold lands in the territories of the United States, and American citizens who now hold lands in the dominions of his Majesty, shall continue to hold them according to the nature and tenure of their respective estates and titles therein; and may grant, sell, or devise the same to whom they please, in like manner as if they were natives; and that neither they nor their heirs or assigns shall, so far as may respect the said lands and the

**13.** As quota immigrants within the meaning of the Immigration Act of 1924, ch. 190, § 5, 43 Stat. 153, 155, the Canadians were denied the benefit of an exception for aliens visiting the United States as tourists or temporarily for business or pleasure.

**14.** Note 12, supra.

**15.** Note 2, supra.

the appellee here claims is concerned, the War of 1812 ended the right which the appellee now claims of bringing her goods across the border and into the United States without the payment of duty. [88 F.2d at 323, 24 CCPA at 418.]

### Issue

The issue before the court is whether the Customs Court was correct in holding that the provisions of Article III of the Jay Treaty, which granted to the Indians the right to pass and repass the territories of the two parties with personal goods and effects without the payment of duty, are no longer in force or effect.

### OPINION

■ Appellant urges that as an Indian and beneficiary of the Jay Treaty, he should be exempt from paying a customs duty on his personal goods as provided in Article III. We agree with the Customs Court that the provisions of Article III, relied on by appellant, are no longer in force.

The Supreme Court decided in *Karnuth* that the free-passage "privilege" of Article III was wholly promissory and prospective, rather than vested, in nature.

The Court stated in comparing Articles IX and III of the Jay Treaty:

Article IX [note 11] and Article III relate to fundamentally different things. Article IX aims at perpetuity and deals with existing rights, vested and permanent in character, in respect of which, by express provision, neither the owners nor their heirs or assigns are to be regarded as aliens. These are rights which, by their very nature, are fixed and continuing, regardless of war or peace. But the privilege accorded by Article III is one created by the treaty, having no obligatory existence apart from that instrument, dictated by considerations of mutual trust and confidence, and resting upon the presumption that the privilege will not be exercised to unneighborly ends. It is, in no sense, a vested right. It is not permanent in its nature. It is wholly promisso-ry and prospective and necessarily ceases to operate in a state of war, since the passing and repassing of citizens or subjects of one sovereignty into the territory of another is inconsistent with a condition of hostility. [279 U.S. at 239, 49 S.Ct. at 277.]

Deciding that the privilege to pass and repass was established with a view toward peaceful relations between the signatories, the Court further concluded that free passage was based on "mutual trust and confidence" and therefore was inconsistent with hostile conditions. The Court further stated:

The reasons for the conclusion are obvious—among them, that *otherwise the door would be open for treasonable intercourse.* And it is easy to see that such freedom of intercourse also may be incompatible with conditions following the termination of the war. Disturbance of peaceful *relations between countries occasioned by war, is often so profound that the accompanying bitterness, distrust and hate indefinitely survive the coming of peace.* The causes, conduct or result of the war may be such as to render a revival of the privilege inconsistent with a new or altered state of affairs. The grant of the privilege connotes the existence of normal peaceful relations. When these are broken by war, it is wholly problematic whether the ensuing peace will be of such character as to justify the neighborly freedom of intercourse which prevailed before the rupture. It follows that the provision [Article III] belongs to the class of treaties which does not survive war between the high contracting parties * * *. [279 U.S. at 239–40, 49 S.Ct. at 277, emphasis added.]

Granting free-passage rights to citizens and subjects of hostile nations enhances the possibility of treasonable intercourse. It is reasonable to anticipate that subjects of hostile nations would participate in treasonable activity. At time of war, expectations of normal human activity cannot be relied upon. Hostility and distrust undercut codes of conduct, thereby compelling an interrup-

tion of free passage, not only for citizens but also for subjects. Furthermore, a formal termination of the physical conflict does not guarantee resumption of normal peaceful relations. An altered state of affairs often necessitates modification of the legal interface between the hostile nations. *Karnuth* held that Article III was nullified by the War of 1812, with respect to free passage of "citizens or subjects" of the warring nations. Indians who were subjects of the warring nations were not excepted from the *Karnuth* holding.

Abrogation of the free-passage provision does not necessarily affect other provisions. Independent provisions can survive.[16] The Customs Court, however, correctly concluded that the duty exemption is logically dependent upon the free-passage provision. Each is personal and involves the physical movement of an individual.[17] Abolishing physical passage to prevent treasonable intercourse dictates by necessity the abrogation of the duty exemption for personal goods.[18] *Garrow* applied the *Karnuth* rationale to the duty provisions of Article III of the Jay Treaty and determined that the plaintiff Indian, a resident of Canada, was within the category of "citizens or subjects."

The holding of the Third Circuit in *McCandless* that the Indian free-passage right was not extinguished by the War of 1812 is in direct conflict with the rationale of *Karnuth*. Faced with these two inconsistent holdings, we recognize that the Supreme Court decision must control.

We also agree with the Customs Court that a significant indication of the status of the duty exemption of Article III is the legislation passed by Congress. Congress passed a Tariff Act in 1799 [19] while the Jay Treaty was in effect. Section 105 of the act provided for duty-free treatment of peltries and of "the proper goods and effects of [Indians]." The purpose of section 105, as stated in section 104, was to circumscribe treaty rights. Substantially identical language was continuously reenacted by Congress in tariff acts until 1897. In that year, the tariff laws containing the provision were repealed and no such provision has been provided in statutes since that time. We are left with one conclusion to be drawn from these Congressional manifestations; that Congress intended to terminate the Indian duty exemption.

■ The Congressional intent as manifest in the Tariff Act of 1897 has significance not only with regard to the statutory duty exemption but also with regard to the Jay Treaty duty exemption. As a rule of priority between equals, a later dated statute in direct conflict with a treaty supersedes the treaty. *The Cherokee Tobacco*, 78 U.S. (11 Wall.) 616, 20 L.Ed. 227 (1870);

---

16. *Clark v. Allen*, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947).

17. Akins also argued before the lower court that Article III was at most suspended by the War of 1812, because the Indian-duty exemption was commercial rather than personal. Akins cited *Sophie Rickmers*, 45 F.2d 413 (S.D. N.Y.1930), in which a tonnage-duty exemption in the Prussian Treaty of 1828 was held to be commercial in nature and therefore, only *suspended* by World War I. The Customs Court concluded that no right of entry was at issue in that case as contrasted with the instant case in which the Article III Indian-duty exemption is "personal in character and interwoven with the actual *physical passage* of the Indians."

18. Akins argues that if the right of free passage and the customs exemption are not severable, the exemption must be preserved with the right of free passage which now exists by statute in

8 U.S.C. 1359. This argument confuses the rights in the treaty with those separately protected by statute. The fact that the two rights were intertwined in the treaty in no way prohibits Congress from treating them separately when legislating on the same subject. Congress has clearly done so by preserving the free-passage right (8 U.S.C. § 1359) while repealing the duty exemption (Tariff Act of 1897). We are not persuaded by Akins' suggestion that the Article III customs exemption was preserved as to neutral Indians residing in the United States even though it may not have been preserved as to Canadian Indians. Under the *Karnuth* rationale, the place of residence of the Indian in question has no bearing, nor does his tribe's manifestation of allegiance or neutrality.

19. Ch. XXII, 1 Stat. 627.

*Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 7 L.Ed. 415 (1829). The Tariff Act of 1897 is in direct conflict with the duty-free provision of Article III of the Jay Treaty. In clear language, the act repealed sections of the Tariff Act of 1894, including the duty exemption, and all other acts inconsistent with the repealing statute. The language of the duty-free provision of the Jay Treaty is substantially identical with the repealed provision. The Tariff Act of 1897 served not only as an expression of Congressional intent to repeal the statutory right, but also as a termination of the Indian duty exemption of Article III of the Jay Treaty.[20]

### Conclusion

Tracing the duty exemption of Article III of the Jay Treaty through case law, statutes, and historical events reveals competing considerations. Analysis of the competing considerations brings us to the following conclusions.

We are bound by the Supreme Court's decision and rationale in *Karnuth*. *Garrow* properly extended the rationale to Indians as "citizens or subjects" of the sovereign. As a Penobscot Indian residing in the United States, the appellant is a "citizen or subject" within the *Garrow* rationale. *Karnuth* and *Garrow* together compel us to find that the personal duty exemption, only prospective in nature, was abrogated by the War of 1812.

In addition, statutory manifestations subsequent to the Jay Treaty indicate that Congress intended that the duty exemption no longer remained in force. The case law reinforces the statutory evidence. On this record, we are constrained to find in favor of the appellee. Although a measure of the equities lies with the Indians, we cannot revive the duty exemption which history and the law have firmly ended. Accordingly, the judgment of the Customs Court granting the appellee's cross-motion for summary judgment is *affirmed*.

**20.** Since the time of the enactment of the Jay Treaty, the Indians have been given citizenship. It might be argued that as citizens they should

not be accorded privileges which are denied to other United States citizens.