## UNITED STATES ex rel. DIABO v. Mc-CANDLESS.

(District Court, E. D. Pennsylvania. March 18, 1927.)

No. M—54.

Aliens ⬚46—American Indians are not excluded by immigration laws.

The American Indians are not among the members of the alien nations whose admission is controlled and regulated by existing immigration laws.

Habeas Corpus. Proceeding by the United States, on the relation of Paul Diabo, against John B. McCandless. Sur hearing on petition, return, and proofs. Relator discharged on giving bond.

Adrian Bonnelly and William N. Nitzberg, both of Philadelphia, Pa., for relator.

George W. Coles, U. S. Atty., of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. The question to be ruled is one of law, and turns upon the rights of those known to us as American Indians.

### Finding.

The conclusion we have reached is that the relator has the right to be discharged from

custody upon giving the bond herein required of him.

### Discussion.

We may be taking a too broad view of the question raised, and because of this an inadequate one. The cause presents to us, however, a different question from that discussed. The Indians have always been recognized by us as a nation and as a race independent of our governmental control in the ordinary sense of that phrase. In this sense they are an alien people, but at the same time we have likewise, from our point of view, felt toward them the relation of wardship. Territorially as a nation they have always been an imperium in-imperio, although we have from time to time negotiated treaties with them for the surrender to us of the exclusive occupancy of described parts of what they claimed to be their territory, but which was otherwise always regarded by us as our territory. In like manner, we have from time to time allotted territory to them, and protected them in its occupancy. This practice has given us the word "reservations." Divisions of the Indian race into nations and tribes have always been recognized. This had more than a merely ethnological significance. Maps and other publications of official authority are in existence, showing the territorial distribution of the Indians and tribal divisions and land occupancy. The areas indicated could never be more than approximate, as the sites of the habitats of the different tribes were ever in a state of shift.

At the time the boundary line between the United States and the now Dominion of Canada was fixed and located by agreement with Great Britain, the line was run in large part through what may be termed Indian territory in the sense of lands, the right of occupancy of which was recognized by both the contracting parties to be in the Indians. The boundary line to establish the respective territory of the United States and of Great Britain was clearly not intended to, and just as clearly did not, affect the Indians. It made no division of their country. The Jay Treaty of 1794 recognized this fact in the provision that the Indians residing on either side of the line, which as between the United States and Great Britain was established as a boundary line, should be unaffected in their right to pass this line at will. It has been argued to us pro and con that this treaty was abrogated by the War of 1912. We do not see that the rights of the Indians are in any way affected by the treaty, whether now existent or not. The

reference to them was merely the recognition of their right, which was wholly unaffected by the treaty, except that the contracting parties agreed with each other that each would recognize it. The right of the Indians remained, whether the agreement continued or was ended. The question of the right of the relator to enter the territory of the United States does not turn upon any treaty with Great Britain, although, of course, if we have an agreement to permit him to enter, we will make good our promise, unless it has been duly revoked.

The turning point of the cause is thus to be sought in the answer to the question of whether the Indians are included among the members of the alien nations whose admission to our country is controlled and regulated by the existing immigration laws. The answer, it seems to us, is a negative one. From the Indian viewpoint, he crosses no boundary line. For him this does not exist. This fact the United States has always recognized, and there is nothing in this legislation to work a change in our attitude. This does not mean that the United States could not exclude him, but it does mean that the United States, having recognized his right to go from one part of his country to another unobstructed by a boundary line, which as to him does not exist, will not be taken to have denied this right, unless the clear intention so to do appears. We do not find such denial in any of the cited exclusion acts of Congress.

To afford the opportunity for appellate review, upon the relator giving bond to abide by any order made by the court upon appeal duly taken, he is discharged from custody.