**Andrew AKINS et al., Plaintiffs,**

**v.**

**William SAXBE et al., Defendants.**

**Civ. No. 2031 N. D.**

United States District Court,
D. Maine, N. D.

June 20, 1974.

David C. Crosby and Thomas N. Tureen, Calais, Me., Robert N. Moore, Jr., Houlton, Me., for plaintiffs.

Peter Mills, U. S. Atty., Portland, Me., Anthony S. Borwick, Atty., Dept. of Justice, Washington, D. C., for defendants.

## OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

Plaintiffs in this action are eight individual members of the Micmac, Maliseet, Penobscot and Passamaquoddy Indian Tribes, and the Indian Township Passamaquoddy Basket Cooperative, Inc., an Indian-owned agricultural cooperative organized under Maine law. Seven of the individual plaintiffs reside in Maine on the American side of the International Border between the United States and Canada, and one resides in New Brunswick on the Canadian side of the boundary. Defendants are the Secretary of the Treasury and the Attorney General of the United States. In the first claim for relief of the complaint, the individual plaintiffs resident in Maine seek a declaratory judgment that Article III of the Treaty of Amity, Commerce and Navigation of 1794 between the United States and Great Britain (the Jay Treaty) exempts from any customs duty goods purchased in Canada and brought into the United States by the plaintiffs for their personal use and not for resale, and request an order enjoining the Secretary from levying and collecting any customs duty on such goods. In the second claim for relief, the Cooperative seeks a declaratory judgment that Article III of the Jay Treaty exempts from customs duties both materials gathered or purchased in Canada and brought by the Cooperative into the United States for use by its members in manufacturing "distinctively Indian handicrafts" and Indian handicrafts manufactured in Canada and brought into the United States by the Cooperative or Canadian-born Indians for sale through the Cooperative. In the third claim for relief, three Canadian-born Indians seek a declaratory judgment that 8 U.S.C. § 1359 exempts them from the registration and visa requirements applying to aliens under the Immigration and Naturalization laws, and request an order enjoining the Attorney General from requiring the plaintiffs to register as aliens and to obtain immigration visas. Plaintiffs predicate jurisdiction of the first two claims upon 28 U.S.C. §§ 1331, 1337, 1340 and 1361 and jurisdiction of the third claim upon 28 U.S.C. §§ 1331, 1337 and 1361. Presently before the Court are the motion of the Secretary to dismiss the first two claims on the ground that this Court lacks jurisdiction over the subject matter of these claims and the cross-motions of the Attorney General and of the plaintiffs for summary judgment on the third claim for relief. For the reasons to be stated, the Court grants the Secretary's motion to dismiss the first two claims and grants plaintiffs' motion for summary judgment on the third claim.

### The Historical Background

There is no dispute as to the historical background of the present litigation. From approximately 1675 until 1850, the Micmac, Maliseet, Penobscot and Passamaquoddy Indian Tribes constituted the

Wabanaki Confederacy. The territory claimed by the member tribes of the Confederacy and in which they traveled and traded freely encompassed the region from what is today the western boundary of the State of Maine to Nova Scotia, Canada. During the Revolutionary War, these four tribes fought with the American colonies against Great Britain. The Peace of Paris, which ended the Revolutionary War in 1783, established the International Boundary between the newly-formed United States and the remaining British possessions in Canada, which ran through the middle of the territory occupied by the four tribes of the Wabanaki Confederacy. Apparently in response to anxiety and confusion among the tribes as to their status with respect to the International Boundary, in 1794 the United States and Great Britain adopted Article III of the Jay Treaty, 8 Stat. 116, which provided in relevant part:

It is agreed that it shall at all times be free to his Majesty's subjects, and to the citizens of the United States, and also to the Indians dwelling on either side of the said boundary line, freely to pass and repass by land or inland navigation, into the respective territories and countries of the two parties, on the continent of America (the country within the limits of the Hudson's bay Company only excepted) and to navigate all the lakes, rivers and waters thereof, freely to carry on trade and commerce with each other.

\* \* \* \* \* \*

No duty of entry shall ever be levied by either party on peltries brought by land, or inland navigation into the said territories respectively, nor shall the Indians passing or repassing with their own proper goods and effects of whatever nature, pay for the same any import or duty whatever. But goods in bales, or other large packages, unusual among Indians, shall not be considered as goods belonging bona fide to Indians.

Article XXVIII of the Jay Treaty also provided:

It is agreed, that the first ten articles of this treaty shall be permanent
. . . .

In 1796, the United States and Great Britain further agreed to the Explanatory Article of May 4, 1796, 8 Stat. 130, which provided in part:

That no stipulations in any treaty subsequently concluded by either of the contracting parties with any other state or nation, or with any Indian tribe, can be understood to derogate in any manner from the rights of free intercourse and commerce, secured by the aforesaid third article of the treaty of amity, commerce and navigation to the subjects of his Majesty and to the citizens of the United States, and to the Indians dwelling on either side of the boundary—line aforesaid; but that all the said persons shall remain at full liberty freely to pass and repass by land or inland navigation, into the respective territories and countries of the contracting parties, on either side of said boundary —line, and freely to carry on trade and commerce with each other, according to the stipulations of the said third article of the treaty of amity, commerce and navigation.

The provision of Article III of the Jay Treaty relating to duties was incorporated in various tariff acts until 1897, but the Article III language granting Indians the right to enter duty free was not included in the Tariff Act of 1897, 30 Stat. 151, and it has not been included in any subsequent tariff act.

Although the exact time when duties were first charged on goods brought across the border by Indians is not known, in 1937, the Court of Customs and Patent Appeals held in United States v. Garrow, 88 F.2d 318 (C.C.P.A.), cert. denied, 302 U.S. 695, 58 S.Ct. 14, 82 L.Ed. 537 (1937), that Article III of the Jay Treaty had been abrogated by the War of 1812, and that the right of Indians to enter duty-free, insofar as it had been created by statute, lapsed in 1897 when the Article III language incor-

porated in previous tariff acts was not renewed. Relying on the court's ruling in *Garrow,* the Secretary, through the Bureau of the Customs, has been levying customs duties on goods brought into the United States by Indians, including these plaintiffs.

Immigration officials evidently recognized a right in Canadian-born Indians to cross the International Boundary and to remain in the United States free from the usual restrictions placed on aliens until the passage of the Immigration and Nationality Act of 1924, 43 Stat. 153, at which time the Department of Labor began deporting Canadian-born Indians who had entered the country without registering as aliens and without obtaining immigrant visas. Following a successful court challenge to the Department's policy, United States ex rel. Diabo v. McCandless, 18 F.2d 282 (E.D.Pa.1927), aff'd, 25 F.2d 71 (3rd Cir. 1928), Congress, in 1928, enacted legislation, currently codified (as amended) as 8 U.S.C. § 1359, which provides as follows:

> Nothing in this subchapter [dealing with immigration] shall be construed to affect the right of American Indians born in Canada to pass the borders of the United States, but such right shall extend only to persons who possess at least 50 per centum of blood of the American Indian race.

It has been, and continues to be, the position of the Attorney General that Section 1359 exempts Canadian-born Indians from the pre-entry alien registration and visa requirements of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1301,[1] but that Section 1359 does not exempt them from the post-entry alien registration and notification requirements of the Act, 8 U.S.C. §§ 1302(a), 1305, 1306, if they wish to remain in the United States for 30 days or more.[2] In accordance with this policy, the Attorney General has not required Canadian-born Indians to register as aliens and obtain immigrant visas as a condition of entry into the United States, but the Attorney General, acting through officers and agents of the Immigration and Naturalization Service, has required Canadian-born Indians, including these plaintiffs, who wish to stay in the United States for more than 30 days to comply with the registration and reporting requirements of the Act.

### The Motion to Dismiss the First and Second Claims for Relief

Plaintiffs' first and second claims for relief are based on Article III of the Jay Treaty and the Explanatory Article of 1796, which plaintiffs contend exempt from customs duties goods purchased by them in Canada and brought into the United States for personal use and not for resale. The Court does not, however, reach the merits of these claims, inasmuch as the Court is persuaded Congress has committed the issue here presented to the exclusive jurisdiction of the Customs Court.

---

1. 8 U.S.C. § 1301 provides:
   No visa shall be issued to any alien seeking to enter the United States until such alien has been registered and fingerprinted in accordance with section 1201(b) of this title, unless such alien has been exempted from being fingerprinted as provided in that section.

2. 8 U.S.C. § 1302(a) provides:
   (a) It shall be the duty of every alien now or hereafter in the United States, who (1) is fourteen years of age or older, (2) has not been registered and fingerprinted under section 1201(b) of this title or section 30 or 31 of the Alien Registration Act, 1940, and (3) remains in the United States for thirty days or longer, to apply for registration and to be fingerprinted before the expiration of such thirty days.

   8 U.S.C. § 1305 requires every alien subject to Section 1302(a) to notify the Attorney General of his current address as of the first day of every year and to notify the Attorney General of every change of address during any year.

   Section 1306 makes it a crime to fail to comply with either the Section 1302 registration requirements or the Section 1305 notification requirements.

The Customs Court is given exclusive jurisdiction over customs matters by 28 U.S.C. § 1582, which provides in relevant part:

(a) The Customs Court shall have *exclusive jurisdiction* of civil actions instituted by any person whose protest pursuant to the Tariff Act of 1930, as amended, has been denied, in whole or in part, by the appropriate customs officer, where the administrative decision, including the legality of all orders and findings entering into the same, involves: . . . (2) the classification and rate and amount of duties chargeable; (3) all charges or exactions of whatever character within in the jurisdiction of the Secretary of the Treasury; . . . . (emphasis supplied).

Conversely, jurisdiction over customs matters is denied to the District Courts by 28 U.S.C. § 1340:

The district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue, or revenue from imports or tonnage *except matters within the jurisdiction of the Customs Court.* (emphasis supplied).

■ On their face, these provisions vest only the Customs Court with the power to consider plaintiffs' claims. Plaintiffs argue, however, that the jurisdiction of the Customs Court is limited to matters relating to the imposition of duties on "imported" merchandise and that the goods plaintiffs seek to bring into the country are not "imports," because Indians crossing the International Boundary are not engaged in the act of "importation." [3] Relying primarily on In re Fassett, 142 U.S. 479, 12 S.Ct. 295, 35 L.Ed. 1087 (1891) and on the Insular Tax Cases, 182 U.S. 1 et seq. (1900), particularly DeLima v. Bidwell, 182 U.S. 174, 21 S.Ct. 743, 45 L.Ed. 1041 (1900), plaintiffs maintain that the jurisdiction of the Customs Court, as defined in Section 1582(a)(2) and (3), is limited to questions relating to the rates and amounts of duties chargeable on articles which are conceded to be imported, and does not extend to the question of whether the goods are in fact imported. The Court disagrees.

*Fassett* and *DeLima* arose under the Customs Administrative Act of 1890, 26 Stat. 131. In *Fassett*, the Supreme Court held that a libel action in admiralty, the sole issue in which was whether a yacht taxed by the Customs Collector was an imported article, was properly before the District Court because the 1890 Act limited the jurisdiction of the Customs Court to questions relating to the rates and amounts of duties payable on articles agreed to be imported, but did not extend to the Customs Court authority to determine the threshold issue of importation. In *DeLima*, the Supreme Court, following *Fassett*, ruled that an action challenging the customs taxation of sugar from Puerto Rico was properly within the jurisdiction of the District Court and not within the jurisdiction of the Customs Court, because the contested issue was whether Puerto Rico, a possession of the United States,

---

**3.** In light of the court's conclusion that the issue of importation is within the exclusive jurisdiction of the Customs Court, it is not necessary to consider whether the goods plaintiffs seek to bring into the country are "imports." The Court will observe, however, that plaintiffs' argument that they are not imports is predicated upon the dubious proposition that Article III of the Jay Treaty "erased" the International Boundary vis-a-vis the Indians living on either side of the border, and that it therefore cannot be said that an Indian crossing the border with his goods enters the United States from a foreign country. The argument is based, not on the words of the Jay Treaty, but on the holding of the District Court in United States ex rel. Diabo v. McCandless, *supra.* Plaintiffs' claim that the International Boundary does not exist with respect to them is not supported by the Court of Appeals' decision in *McCandless*, which affirmed the District Court on significantly different grounds, or by the language of the Treaty, which by confirming the right of Indians "to pass and repass" between Canada and the United States plainly recognized the existence of an international boundary line.

was a foreign country within the meaning of the Act.

Since the decisions in *Fassett* and *DeLima,* subsequent customs legislation has significantly modified the 1890 Customs Administrative Act, and in cases arising under the more recent customs laws, the courts have consistently rejected jurisdictional arguments similar to that advanced by the present plaintiffs. Argosy Ltd. v. Hennigan, 404 F.2d 14 (5th Cir.1968); J. C. Penney Co., Inc. v. United States Treasury Department, 439 F.2d 63 (2d Cir.), cert. denied, 404 U.S. 869, 92 S.Ct. 60, 30 L.Ed.2d 113 (1971); Kocher v. Fowler, 130 U.S.App.D.C. 80, 397 F.2d 641 (1967), cert. denied, 391 U.S. 920, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968); North American Cement Corp. v. Anderson, 109 U.S.App.D.C. 162, 284 F.2d 591 (1960); Eastern States Petroleum Corp. v. Rogers, 108 U.S.App.D.C. 63, 280 F.2d 611, cert. denied, 364 U.S. 891, 81 S.Ct. 222, 5 L.Ed.2d 187 (1960); Morgantown Glassware Guild v. Humphrey, 98 U.S.App.D.C. 375, 236 F.2d 670, cert. denied, 352 U.S. 896, 77 S.Ct. 133, 1 L.Ed.2d 87 (1956); Riccomini v. United States, 69 F.2d 480 (9th Cir. 1934); Cottman Co. v. Dailey, 94 F.2d 85 (4th Cir. 1938); Altieri v. United States, 299 F.Supp. 458 (D.P.R.1969); Horton v. Humphrey, 146 F.Supp. 819 (D.D.C.), aff'd without opinion, 352 U. S. 921, 77 S.Ct. 224, 1 L.Ed.2d 157 (1956). Particularly apposite to the present case is Argosy Ltd. v. Hennigan, *supra,* a suit to enjoin the seizure of a yacht on which duty had not been paid, in which the plaintiff contended that the yacht was not an imported article within the meaning of the customs laws. The Court of Appeals rejected the plaintiff's contention that only the District Court had jurisdiction over the issue of importation. While recognizing that *Fassett* supported the plaintiff's position, the court pointed out that the 1890 Act, under which *Fassett* was decided, had been superseded by the Tariff Laws of 1909, 36 Stat. 100, 1913, 38 Stat. 187, 1922, 42 Stat. 858, and 1930, 46 Stat. 590, and the later acts had made such sub-stantial revisions in the 1890 Act that *Fassett* could no longer be considered controlling on the import issue. Specifically, the *Argosy* court noted that the decision in *Fassett* was based largely upon two distinctive characteristics of the 1890 Act: (1) in order to present its claim before the Board of Appraisers (presently, United States Customs Court), the plaintiff was required to concede the issue of importation and (2) the authority of the Customs Collector, and of the Board of Appraisers on appeal from the Collector's decision, was limited to decisions "as to the rate and amount of the duties chargeable upon *imported* merchandise" and did not extend to the determination of whether or not an article was an import. Distinguishing *Fassett,* the *Argosy* court observed: (1) that under the more recent statutes the concession of importation was no longer necessary to assert a claim, United States v. Porto Rico Coal Co., 17 C.C.P.A. 288 (1929), and (2) that the term "imported merchandise" had been dropped altogether from the subsequent statutes and the significant phrase "including the legality of all orders and findings entering into the same" had been added. The court said:

> This statutory trend toward a more comprehensive authority for the Customs Collector . . . further weakens the vitality of *Fassett.* We think that Congress, by deleting the "imported merchandise" language of section 14 and adding "including the legality of all orders and findings entering into the same," plainly authorized the Collector to determine whether the merchandise was imported. This authority was likewise extended to the scope of review in the Customs Court. Thus, 28 U.S.C.A. § 1583 [predecessor to present § 1582] establishes by the phrase, "including all orders and findings entering into the same," that the Customs Court's jurisdiction is coextensive with the Collector's decision-making power.

\* \* \* \* \* \*

We are not at liberty to disregard the successive amendments which have occurred since *Fassett*. They indicate that the jurisdiction of the Customs Court is today considerably more comprehensive than was the jurisdiction of its predecessor, the United States Board of General Appraisers, in 1892. Its jurisdiction not only is exclusive of other courts, but over the years has grown more inclusive whenever matters pertaining to the customs laws have been concerned. (citations omitted). 404 F.2d at 19–20.

Noting "the Congressional purpose to provide 'a complete system of corrective justice with respect to matters arising under the customs laws,' " *Id.* at 20, the court concluded,

To allow the question of importation to be determined in one court, and the rates and duties chargeable in another, would only fractionate the administration of the customs laws and defeat the congressional policy of decisional uniformity. *Id.* at 21.

*See also* J. C. Penney Co. v. United States Treasury Department, *supra*, 439 F.2d at 65–66.

■ In sum, the *Argosy* analysis makes clear that the determination of the importation issue is within the exclusive jurisdiction of the Customs Court. Indeed, a most compelling illustration of that Court's jurisdiction over the importation question is its exercise of jurisdiction in United States v. Garrow, *supra*, which, involved an importation issue virtually identical to that presented here.

■ Plaintiffs argue that, even though 28 U.S.C. § 1340 denies to the District Courts jurisdiction over matters within the jurisdiction of the Customs Court, jurisdiction is properly in this Court pursuant to 28 U.S.C. §§ 1331, 1337 and 1361. Clearly, however, none of these statutes provides this Court with subject matter jurisdiction of the present controversy. The Court of Appeals in Eastern States Petroleum Corp.

v. Rogers, *supra*, in a case similar to that against the Secretary, rejected the contention that Section 1331 conferred jurisdiction:

Appellant contends, however, that the District Court has jurisdiction notwithstanding the exception in § 1340, since this is not a case "arising under any Act of Congress providing for \* \* \* revenue from imports \* \* \*." Rather, they contend it is a case "aris[ing] under the Constitution, laws, or treaties of the United States," and thus within the ambit of 28 U.S.C. § 1331 (1958). Section 1331 vests federal question jurisdiction in the district courts and, unlike § 1340, contains no exception relating to Customs Court jurisdiction. But we do not agree that Congress' failure to provide an exception to § 1331 similar to that specified in § 1340 indicates an intent to open a loophole in its clear purpose to exclude customs cases from the district courts. When Congress provides a specific judicial remedy, relief may generally be accorded only through the specified procedure. (citations omitted). 280 F. 2d at 613.

*See also* J. C. Penney Co. v. United States Treasury Department, *supra*, 439 F.2d at 68. The same reasoning applies to Section 1337. It is also firmly established that Section 1361, the mandamus statute, does not confer subject matter jurisdiction where otherwise none exists. J. C. Penney Co. v. United States Treasury Department, *supra*; Sprague Electric Co. v. Tax Court of United States, 230 F.Supp. 779 (D.Mass.1964), aff'd, 340 F.2d 947 (1st Cir.1965).

■■ Finally, the relief sought in plaintiffs' first two claims for relief is foreclosed by the Anti-Injunction Act, 26 U.S.C. § 7421(a), which bars actions "for the purpose of restraining the assessment or collection of any tax," and by the Declaratory Judgments Act, 28 U.S.C. § 2201, which excepts from its jurisdictional grant controversies "with respect to Federal taxes." The Supreme Court has only recently reaffirmed that the Anti-Injunction Act and the federal

tax exception to the Declaratory Judgments Act oust the federal courts of subject matter jurisdiction over such suits by prohibiting pre-enforcement injunctive or declaratory relief against the assessment or collection of federal taxes. Alexander v. "Americans United" Inc., 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518 (U.S. May 15, 1974); Bob Jones University v. Simon, 416 U.S. 725, 94 S. Ct. 2038, 40 L.Ed.2d 496 (1974). It is well settled that the Anti-Injunction Act proscription and the Declaratory Judgments Act exception include suits seeking injunctive or declaratory relief against the assessment of customs duties. J. C. Penney Co. v. United States Treasury Department, *supra*, 439 F.2d at 68–69; Cottman v. Dailey, *supra* at 89; Horton v. Humphrey, *supra*, 146 F. Supp. at 821 n.5; Altieri v. United States, *supra* at 459. Plaintiffs contend that the Secretary's claim has so little substance as to make the Anti-Injunction Act inapplicable under the rule enunciated by the Supreme Court in Miller v. Nut Margarine Co., 284 U.S. 498, 52 S.Ct. 260, 76 L.Ed. 422 (1932). Simply stated, that rule was that the Anti-Injunction Act will not apply if "special and extraordinary circumstances," such as a demonstration of substantial and irreparable injury, exist "to bring the case within some acknowledged head of equity jurisprudence." *Id.* 284 U.S. at 509, 52 S.Ct. at 263. However, in Enochs v. Williams Packing and Navigation Co., Inc., 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962), the Supreme Court expressly limited the *Nut Margarine* holding. In *Williams Packing*, the Court held that an injunction against the assessment of taxes may issue only (1) "if equity jurisdiction otherwise exists," *Id.* at 7, and (2) "if it is clear that under no circum-

stances could the Government ultimately prevail . . .," *Ibid.* In *Alexander* and *Bob Jones University*, the Court made clear that, unless *both* the conditions delineated in *Williams Packing* are met, a suit for preventive injunctive relief must be dismissed. Alexander v. "Americans United" Inc., *supra*, 416 U. S. at 758–759, 94 S.Ct. at 2057; Bob Jones University v. Simon, *supra*, 416 U.S. at 745, 94 S.Ct. at 2050. In the present case, plaintiffs can meet neither condition. It is apparent that the Secretary's position, which is squarely supported by United States v. Garrow, *supra*, is sufficiently meritorious and the plaintiffs' position "sufficiently debatable to foreclose any notion that 'under no circumstances could the Government ultimately prevail.' " Bob Jones University v. Simon, *supra* at 749, 94 S.Ct. at 2052. It is equally evident that plaintiffs' right to seek relief in the Customs Court provides an adequate and appropriate opportunity to litigate their claims and negates the suggestion that the absence of an adequate legal remedy requires that this Court exercise its equitable jurisdiction to grant relief. *Cf.* Alexander v. "Americans United" Inc., *supra*, 416 U.S. at 759–762, 94 S.Ct. at 2058–2059; 416 U.S. at 744–750, 94 S.Ct. at 2049–2052.

Since the subject matter of plaintiffs' first and second claims for relief is within the exclusive jurisdiction of the Customs Court, these claims must be dismissed for lack of subject matter jurisdiction in this Court. [4]

*The Cross-Motions for Summary Judgment On the Third Claim for Relief*

In the third claim for relief of the complaint three Canadian-born Indians contend that 8 U.S.C. § 1359 exempts them from the visa and registration require-

---

4. With their brief in opposition to the defendant's motion to dismiss for lack of subject matter jurisdiction, plaintiffs submitted an affidavit of Gaddis Smith, a professor of American diplomatic history at Yale University, which purports to construe portions of Article III of the Jay Treaty relevant to the merits of the plaintiffs' claims for relief against the Secretary. The defendant has moved to strike Professor Smith's affidavit on the ground that it is not made upon personal knowledge as required by Fed.R.Civ.P. 56(e). As the Court has concluded that 28 U.S.C. §§ 1582 and 1340 leave it without jurisdiction over plaintiffs' claims for relief against the Secretary, it is necessary neither to consider the affidavit nor to rule upon the motion to strike.

ments of the Immigration and Nationality Act of 1952, as amended. The defendant Attorney General agrees that the pre-entry visa requirements of 8 U.S.C. § 1301[5] do not apply to plaintiffs but asserts that plaintiffs are subject to the registration requirements of 8 U.S.C. § 1302[6] if they remain in the United States for 30 days or longer. Subject matter jurisdiction of this claim is conceded. No factual issue is presented, and both parties have moved for summary judgment.

■ No controversy exists as to the actual language of 8 U.S.C. § 1359; it provides,

> Nothing in this subchapter [dealing with immigration] shall be construed to affect the right of American Indians born in Canada to pass the borders of the United States, but such right shall extend only to persons who possess at least 50 per centum of blood of the American Indian race.

Implicit in the statutory language is the recognition of an outstanding right, and defendant does not dispute that some right does exist. The contested issue is the scope of that right—the meaning of the statutory language, "the right . . . to pass the borders of the United States." Defendant argues that the plain meaning of this language is that Canadian-born Indians may *cross* the borders without obtaining immigrant visas as a condition of entry into the United States, but that, if Congress had intended to give such Indians the right to *remain* in the United States for 30 days or more without satisfying the requirements of the Immigration and Nationality Act, it could, and would, have said so. "Congress," defendant says, "knows the English language." Concededly, the normal import of a right "to pass" does not encompass a right "to remain," and, concededly, Congress knows the English language. However, the legislative history of Section 1359 and the source of the statutory language, considered in light of accepted principles for the construction of treaties and statutes affecting Indians, foreclose the re-

strictive, literal construction of the phrase "to pass" urged by defendant. The Court is persuaded that, as plaintiffs contend, the intent of Congress in enacting Section 1359 was to preserve the aboriginal right of American Indians to move freely throughout the territories originally occupied by them on either side of the American and Canadian border, and, thus, to exempt Canadian-born Indians from *all* immigration restrictions imposed on aliens by the Immigration and Nationality Act.

The legislative history of Section 1359 confirms the correctness of plaintiffs' interpretation. Article III of the 1794 Jay Treaty, coupled with the Explanatory Article of 1796, recognized the right of American Indians to unfettered movement throughout the territories occupied by them which had been divided by the International Boundary between the United States and Canada established by the Peace of Paris in 1783. United States immigration officials evidently acknowledged a right in Canadian-born Indians to cross the International Boundary and to remain in the United States free from the usual restrictions placed on aliens until the passage of the Immigration and Nationality Act of 1924. With the enactment of the 1924 Act, the Department of Labor determined that Indians were ineligible for admission because they were ineligible for citizenship, and began deporting Canadian-born Indians who had entered the country without registering as aliens and without obtaining immigrant visas. Shortly thereafter, the Department's policy was successfully challenged in United States ex rel. Diabo v. McCandless, 18 F.2d 282 (E.D.Pa.1927), aff'd, 25 F.2d 71 (3rd Cir. 1928). In *McCandless,* a full-blooded Iroquois born in Canada who had come into the United States to work intermittently from 1912 to 1925 was arrested in 1925 and was ordered deported for entering the United States without complying with the immigration laws; he petitioned for a writ of habeas corpus on the ground

---

5. *See* n. 1, *supra.*

6. *See* n. 2, *supra.*

that, as a member of an Indian tribe referred to in the Jay Treaty, he was exempt from the requirements of the immigration laws. The Department of Labor argued that Article III of the Jay Treaty had been abrogated by the War of 1812. The District Court ruled that American Indians had an aboriginal right to move "unobstructed" within the area affected by the boundary line; that this right was *recognized* only, and not created, by Article III of the Jay Treaty; and that, therefore, it was immaterial whether or not the War of 1812 had operated to abrogate the Jay Treaty. The court held that Canadian-born American Indians were not aliens subject to the immigration laws. 18 F. 2d at 283.[7]

It was against this background that Congress, in 1928, enacted the statutory predecessor to 8 U.S.C. § 1359, which read:

> That the Immigration [and Nationality] Act of 1924 shall not be construed to apply to the right of American Indians born in Canada to pass the borders of the United States. 45 Stat. 401.

The Congressional debates, 69 Cong.Rec. 5581–82, 70th Cong., 1st Sess. (March 29, 1928), indicate that the purpose of the 1928 legislation was to correct by statute the Department of Labor's erroneous application of the 1924 Act to American Indians and to reaffirm the right of these Indians to free mobility into and within the United States, a right which had been acknowledged by the Department prior to the 1924 Act and had been recently recognized by the decision of the District Court in *McCandless*.[8]

The source of the language used by Congress in the 1928 Act lends further support to the view that Congress did not intend a literal construction of the phrase "to pass." Defendant concedes that the language "to pass" was taken from the Jay Treaty, the fact the statute used only the words "to pass" rather than the exact Treaty language "to pass and repass" being of no significance. As previously noted, defendant acknowledges that the 1928 statute did not purport to create any new right, but merely to make clear the Congressional intent that the Immigration and Nationality Act of 1924 did not abrogate an existing right belonging to American Indians born in Canada. At the time of the passage of the 1928 statute, the District Court decision in *McCandless* had defined that right as an aboriginal right of these Indians to move freely within their own territory without regard to the International Boundary and free of the restrictions imposed by the immigration laws. As also previously stated, Congress was aware of that decision. Thus, it matters not whether the origin of that right was the aboriginal right of

---

7. The Third Circuit Court of Appeals, while agreeing that Article III of the Jay Treaty merely recognized and did not create the right of the Indians to move freely over their aboriginal territories, affirmed the District Court on the significantly different ground that the Jay Treaty continued in force despite the War of 1812. 25 F.2d at 72–73. In United States v. Garrow, 88 F.2d 318 (C.C.P.A.1937), the Court of Customs and Patent Appeals reached a contrary conclusion as to the continued efficacy of the Jay Treaty. Relying on Karnuth v. United States, 279 U.S. 231, 49 S.Ct. 274, 73 L.Ed. 677 (1929), the *Garrow* court found that the rights of Indians under Article III of the Jay Treaty had been abrogated by the War of 1812. *But cf.*, United States v. Karnuth, 74 F.Supp. 660, 662 (W.D.N.Y.1947).
However, the instant case does not require resolution of this question. The issue presently before this Court is not the status of the Jay Treaty or of any right guaranteed thereunder; the parties are in agreement that a right, irrespective of its source, exists. Rather, the question here is one of statutory construction—what Congress intended as the scope of these plaintiffs' right "to pass" as recognized by 8 U.S.C. § 1359.

8. In sponsoring the bill which was enacted as 45 Stat. 401, Representative MacGregor of New York characterized it as a bill "to exempt American Indians born in Canada from the operation of the immigration act of 1924." 69 Cong.Rec. at 5581. He included in his remarks an explanation of the Department of Labor's application of the immigration laws to such Indians and of the successful challenge to that policy in *McCandless*. *Id.* at 5582.

free passage or Article III of the Jay Treaty. In either case, absent any indication to the contrary, *and irrespective of the present status of the Jay Treaty*, it is reasonable to assume that Congress' purpose in using the Jay Treaty language in the 1928 Act was to recognize and secure the right of free passage as it had been guaranteed by that Treaty and delineated by the District Court decision in *McCandless*.

Finally, two cardinal principles of statutory construction buttress plaintiffs' position that Section 1359 exempts these Indians from the alien registration requirements of Section 1302, as well as from the visa requirements of Section 1301: (1) the language of statutes and treaties affecting Indians must be construed in a nontechnical sense, as the Indians themselves would have understood it and in a manner reflecting the conditions prompting its adoption, and (2) ambiguities in statutes and treaties conferring benefits on Indians are to be resolved in favor of the Indians. *Re statutory construction*: Squire v. Capoeman, 351 U.S. 1, 6–8, 76 S.Ct. 611, 100 L.Ed. 883 (1956); Waldron v. United States, 143 F. 413, 418–19 (Cir. Ct.D.S.D.1905); *see* U. S. Department of the Interior, Federal Indian Law at 401 (U. S. Government Printing Office, 1958). *Re treaty construction*: McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 174–175, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); Choctaw Nation v. Oklahoma, 397 U.S. 620, 631, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970); Menominee Tribe v. United States, 391 U.S. 404, 406, n. 2, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); Peoria Tribe v. United States, 390 U.S. 468, 472–473, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968); Tulee v. Washington, 315 U.S. 681, 684–685, 62 S.Ct. 862, 86 L.Ed. 1115 (1942); United States v. Shoshone Tribe, 304 U.S. 111, 116, 58 S.Ct. 794, 82 L.Ed. 1213 (1938); Carpenter v. Shaw, 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed.

478 (1930); United States v. Payne, 264 U.S. 446, 448–449, 44 S.Ct. 352, 68 L.Ed. 782 (1924); Winters v. United States, 207 U.S. 564, 576, 28 S.Ct. 207, 52 L.Ed. 340 (1908); United States v. Winans, 198 U.S. 371, 380–381, 25 S.Ct. 662, 49 L.Ed. 1089 (1905); Minnesota v. Hitchcock, 185 U.S. 373, 396, 22 S.Ct. 650, 46 L.Ed. 954 (1902); Jones v. Meehan, 175 U.S. 1, 11, 20 S.Ct. 1, 44 L.Ed. 49 (1899); Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). Certainly, in light of these propositions, but even without them, any consistent and coherent construction of the language of Section 1359 compels the conclusion that the words "to pass" are not to be given either a literal or a technical construction and that Section 1359 exempts these Indians from the restrictions imposed on aliens by the immigration laws.

Therefore, defendant's motion for summary judgment on plaintiffs' third claim for relief must be denied, and plaintiffs' motion for summary judgment will be granted.[9]

## ORDER

In accordance with the foregoing, it is ordered as follows:

(1) The motion of the defendant Secretary of the Treasury of the United States to dismiss the first two claims for relief of the complaint is granted; and the Clerk of this Court is directed to enter judgment in favor of said defendant against the plaintiffs dismissing said claims for lack of subject matter jurisdiction;

(2) The motion of the defendant Attorney General of the United States for summary judgment on the third claim for relief of the complaint is denied;

(3) The motion of the plaintiffs Shirley LeVasseur, Robert Pictou and Loomis Sappier for summary judgment on the third claim for relief of the complaint is grant-

9. In accordance with defendants' request, the Court will refer consideration of plaintiffs' prayer for their costs and attorneys' fees pending further briefing and oral argument.

**1222**

ed, and the Clerk of this Court is directed to enter judgment in favor of said plaintiffs against the defendant Attorney General of the United States as follows:

(a) Declaring that the plaintiffs Shirley LeVasseur, Robert Pictou and Loomis Sappier are exempt from the visa and registration requirements of the Immigration and Nationality Act of 1952, as amended;

(b) Permanently enjoining the defendant Attorney General of the United States, his successors, agents and employees, and all those acting in concert with them, from requiring said plaintiffs to comply with the visa and registration requirements of said Act; and

(c) Reserving this Court's jurisdiction of plaintiffs' request for costs and attorneys' fees pending further order of the Court.